

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-11-00072-CV

IN THE INTEREST OF A.C.H. AND
C.L.W., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellants E.S.W. (Father) and T.H. (Mother) appeal the trial court's judgment terminating their parental rights to their two children, A.C.H. and C.L.W. In two issues, Father challenges the sufficiency of the evidence supporting the trial court's endangerment and best interest findings. In three issues, Mother

---

[1]*See* Tex. R. App. P. 47.4.

challenges the sufficiency of the evidence supporting the trial court's best interest finding, contends that the trial court violated her due process rights by failing to release her from a bench warrant, and argues that the trial court abused its discretion by denying her motions for continuance. We affirm.

## II. Background

### A. Trial Evidence

**Michelle Gilley**

Michelle Gilley is a Department investigator. She testified that the Department received a negligent supervision referral in September 2009 relating to drug use in Mother's and Father's home. Gilley interviewed Mother, B.W. (Mother's grandfather), and the children at B.W.'s home in late September, and Mother and B.W. expressed great willingness to cooperate with the Department. Mother also told Gilley, however, that Father was incarcerated at the time for violating his probation. Mother said that she had lived on Prelude Drive before moving into B.W.'s home with the children, that others living in the Prelude Drive house had drug paraphernalia in the home, and that they had used marijuana. Mother later told Gilley that others living in the house had been selling methamphetamines. Mother denied having used drugs and voluntarily submitted to an oral swab drug test. Gilley also observed the children at the visit, and she testified that she did not have any concerns about the children at the time.

Gilley met with Father at his residence on Prelude Drive on December 14, 2009, but only after Father missed several previously-scheduled appointments.

2

Father admitted smoking marijuana but denied using other drugs. He also told Gilley that he was not employed, that he was on probation, and that he was subject to random drug tests. Father also specifically denied any history of domestic violence.

The day after meeting with Father, Gilley received another referral involving Mother and Father for an incident that had occurred on December 11, 2009. A witness had called the police after seeing an altercation between Mother and Father in the street and noticing that both children were present. Mother later told Gilley that she and Father had argued about money and that Father kicked her in the side, pulled her hair, forced her out of the vehicle, put her onto the ground, and kicked her several more times.

B.W. called Gilley in January 2010 and told her that Mother had moved to Kansas City with the children. Mother called Gilley later in January, but instead of offering cooperation, Mother cursed and yelled at her. Gilley located Mother at the Prelude Drive house on February 1, and met with her in person at B.W.'s house the next day. Mother denied living at the Prelude Drive house, said that she was there only to retrieve her things, and told Gilley that she had mostly lived with B.W. at his house since December. However, Mother told Gilley that she was not employed, that she had used methamphetamine the previous night, and that she had smoked marijuana four or five days earlier. Mother also admitted having a bad methamphetamine habit and said that Father was "on [methamphetamine] bad." Mother denied doing drugs with Father, however, and

3

said that Father had kept the children during the times that she was using drugs. Gilley agreed that neither parent had admitted to using drugs with the children present.

Gilley testified that she then began looking at placement options, but none of the three family members proposed by Mother was acceptable. The children's paternal grandfather had a criminal history, the maternal aunt had a history with the Department, and B.W. had recently provided misleading information to Gilley when she was trying to locate Mother. Thus, Gilley requested removal, and the children were placed into foster care.[2]

At the time of removal, the children were two and three years' old, respectively, and they had speech delays, lice, and needed dental work because of brown decay-spots on their teeth. Gilley testified that the children nevertheless seemed happy and that they interacted well with the foster parents. Both children did, however, ask for their parents.

Gilley spoke with Father on February 9, 2010. Father told her that his probation officer had referred him for a drug assessment. Gilley spoke with Mother on February 22, and Mother told her about a recent domestic violence incident involving Father. Mother had declined to give Father money and a ride, and Father had responded by trying to pull Mother out of her truck. Father also

---

[2]Gilley wrote on the notice of removal form that removal was based on Mother's admission of methamphetamine use; Gilley did not note any domestic violence allegations on the form.

4

grabbed a can of gasoline from the back of the truck and poured gasoline all over Mother and the truck. Father then held a lighter toward Mother and threatened to start a fire. Father admitted pouring gasoline on Mother's truck, but he denied pouring gasoline on Mother or threatening to start a fire. Father also admitted that he threw a brick at Mother on a separate occasion and that the brick hit Mother in her side, but Father said he did so because she was trying to run into him with her truck.

Gilley testified that she again met with Father following his visit with the children at the Department offices on February 26. Father admitted arguing with Mother during the December 11 incident, but he denied any physical confrontation. Father also admitted using marijuana and "a little bit of ice" within the previous week, but he told Gilley that he would be interested in drug treatment.

Gilley testified that she reviewed Mother's and Father's criminal histories as part of her investigation. Mother did not yet have a criminal record, but Father did. Between 1999 and 2010, Father had pleaded guilty to criminal mischief, possession of marijuana, assault causing bodily injury, and three instances of theft. Father had also pleaded nolo contendere in 2002 to evading arrest or detention.

On cross-examination, Gilley testified that she found the children to be appropriately cared for and healthy at the time of the initial referral in September 2009 and that the initial referral was closed as "ruled out." She also testified that

5

the children were bonded to their mother, that the children appeared to have an appropriate relationship with Mother, and that the children seemed happy and clean. Gilley also agreed that she did not find anything that involved physical harm to either child in her investigation of the September and December 2009 referrals.

**Brandi Gaut**

Brandi Gaut works for Johnson County and is Mother's probation officer. In July 2010, Mother was placed on five years' probation for possession of less than one gram of a controlled substance.[3] The offense date was April 28, 2010. Gaut met with Mother in July 2010 and learned that Mother was pregnant, was living with a friend who was also on probation, and was planning to move in with B.W. Mother also informed Gaut of this case but asked Gaut not to tell the Department caseworker about her probation.

Mother also submitted to drug tests during her probation. Mother admitted using methamphetamines and marijuana on July 7, 2010, and using marijuana on August 10 and 15, 2010. Because of the continued drug use, Gaut offered Mother the opportunity to voluntarily participate in the "H.O.P.E. In Jail" drug rehabilitation program, but Mother declined because she was pregnant and had

---

[3]Mother was also indicted in Tarrant County in July 2010 for an alleged November 2007 felony of making a false statement in a government record. The indictment alleged that Mother fraudulently stated in an application for government assistance that no one in her home had worked during the previous three months.

6

other obligations, which Gaut testified included her other children. Thus, Gaut contacted the district attorney's office, a warrant was issued, and Mother was arrested. Mother's probation was not revoked, but the court ordered her into the H.O.P.E. In Jail program for 120 days.

Gaut met with Mother twice during her incarceration. During the first visit, Mother was very agitated and vehemently objected to being told not to have any further contact with Father.[4] Mother's demeanor was much better during the second jail visit, and Gaut testified that Mother was in compliance with the terms of her probation at the time of the second visit.

**Rebecca Collins**

Rebecca Collins was Mother and Father's caseworker from February through September 2010. Collins met with Mother and Father at the show cause hearing and discussed the services they would need to complete. Mother expressed interest in drug counseling and seemed eager to work her services. Father also expressed interest in working services and said that he would soon begin drug rehabilitation, that he was subject to random drug testing, and that he was attending Narcotics Anonymous meetings. Father also expressed interest in anger management classes.

---

[4]Gaut testified that one condition of Mother's probation was having no contact with Father. However, Mother and Father had sent letters to one another but had addressed them to B.W. B.W. had forwarded the letters for them.

Collins testified, however, that neither Mother nor Father followed up with their drug assessment referrals and that she had to get new referrals for each parent in May or June 2010. Collins also testified that although she was encouraging Mother and Father to begin their services, they had not started by May 2010. They had made a few appointments, but they did not attend. Mother missed her psychological evaluation appointment in May 2010, both Mother and Father missed their individual counseling appointments in March 2010, and neither parent reported that they had found stable housing or employment. Father submitted to a drug assessment in May 2010, but he was incarcerated shortly thereafter and had not worked toward the completion of his other services before going to jail.

Mother had not worked any of her services as of June 2010. Mother did attempt to have a drug assessment done in early June, but she was not able to do so because the referral had expired. Also in June, Mother reported to Collins that she was pregnant and that Father was the father of the child. Mother and Father had reported to Collins that they were not together anymore, but Collins did not believe them because there were instances of domestic abuse after the children were removed[5] and witnesses had reported having seen Mother and Father in the same car together.

---

[5]Mother reported as late as March 2010 that Father had broken her nose on the day of one of her visits with the children.

8

Collins also discussed Mother's ongoing drug use with her in June 2010. Mother submitted to a drug test in June, but she never completed a drug assessment, a psychological evaluation, or individual counseling. Collins testified that Mother had not worked any of her services before she went to jail in August 2010. However, Collins acknowledged that it is not uncommon for parents to wait six months before starting on their services.

Mother and Father had visitations with the children after removal, but the visitations were separate because of the domestic violence allegations. Father attended all but one or two of the weekly visitations before his incarceration, and Mother attended all but one of her weekly visitations before going to jail. Collins testified that Mother's and Father's interactions with the children were appropriate during the visitations, and they brought the children food and other things to do together during the visits. Collins observed most, if not all, of the visitations, and nothing concerned her about the visitations. She agreed that Mother and Father were very bonded with the children.

Collins testified that there were some concerns with the children shortly after they were placed in foster care. A.C.H. was behind developmentally, had shown signs of depression, and began attending occupational therapy and speech therapy. C.L.W. had ear infections and had tubes placed in his ears, and both children had cavities in their teeth. After a time in foster care, A.C.H.'s speech, fine motor skills, and behavior had improved.

Collins left the Department in September 2010. As of that time, the permanency plan for the children had changed from reunification to termination and adoption because the parents had both been incarcerated, and neither had completed their services.

**Nicoshia Jones**

Nicoshia Jones testified that she assumed responsibilities in this case as the Department caseworker when Collins left in September 2010. Jones learned during the case that Mother was incarcerated in Johnson County and that she was involved in and had completed the H.O.P.E. In Jail program. Despite Mother's completion of that drug program, Jones testified that she believed termination of Mother's and Father's parental rights to be in the children's best interest because Mother and Father cannot provide the stability the children need. Jones also testified that, in her opinion, the Department had made reasonable efforts to work with Mother and Father before their incarcerations and that parents are at fault if they engage in conduct that leads to incarceration.

Jones testified that she visited with the children monthly, but she admitted that she had not had any personal contact with Mother or Father because they had been in jail. Jones further admitted to having little personal knowledge about the parents, their interactions with the children, or their bonds with the children, and she said that Mother and Father had each written letters to the children from jail. But Jones testified that Mother's release from the Johnson County jail during the trial did not affect her opinion concerning termination of parental rights

10

because Mother still had "a ways to go" with the services she did not work before going to jail.

**Cogney Overstreet**

Cogney Overstreet testified that she witnessed the December 2009 incident between Mother and Father. Overstreet testified that she saw Mother and Father arguing and that they had left their truck in the middle of the street. Mother asked Overstreet to watch the children, and Mother followed Father to continue the argument. Overstreet took the children inside her home, and she also talked with the police when they arrived. Overstreet denied seeing a physical altercation between Mother and Father, and she denied telling the police that Mother and Father had a physical altercation. She also denied that the children were outside the truck, testifying that she personally removed the children from the truck before taking them inside her home.

Overstreet testified that she lives across the street from Father and that she had observed him with the children on many occasions. She testified that she believed Father was a "really good dad," that he was "always very attentive to the kids," and that he "just seemed like any other dad with his children." Overstreet also testified that Mother is a good and loving mom and that she and the children seemed to have a good relationship. However, Overstreet acknowledged that good parents do not use methamphetamines, engage in domestic violence in front of their children, or engage in criminal activities that result in incarceration.

11

**Foster Mother**

M.E.S. testified that she is the children's foster mother and that the children had been in her home since February 2010. She testified that she noticed that the children's general appearance was not healthy when they first arrived. They had splotchy coloring on their skin, lice, and significant dental issues, and the children appeared to have not been eating enough nutritional foods. M.E.S. testified that the children showed "very big improvement" after they received vitamins and started eating healthier foods; their coloring improved, and they had more energy.

M.E.S. agreed that A.C.H. was bonded with his family and that he would ask for Father. Father's visitations with the children stopped before Mother's, and A.C.H. would inquire about his father and why he was not at the visitations. At about this same time, A.C.H. returned to M.E.S.'s home after a visitation with Mother, and he tore a picture of Mother into little pieces. A.C.H. also sometimes had meltdowns in public when he realized he was not with Mother and Father, and he had difficulty adjusting after visitations with them. M.E.S. also testified that Mother seemed appropriately concerned for C.L.W. when C.L.W. had tubes placed in his ears and that she had attended the doctor's appointment.

M.E.S. testified that she had a lot of developmental concerns about A.C.H. when he first arrived in her home. He was difficult to understand when he spoke, and he did not always understand what others told him and would instead repeat back any instruction without taking action. A.C.H.'s speech difficulties started to

12

improve with therapy, however. His ability to articulate is still poor, but he is able to understand others much better than before.

A.C.H. also required occupational therapy. Although he was more than three years' old when he entered foster care, A.C.H. could not hold a fork or pick up a crayon. After therapy, A.C.H. learned to do these things and to dress himself. A.C.H. also needed play therapy to work through symptoms of depression. M.E.S. testified that A.C.H. improved after play therapy, and she further testified that his "social skills started developing a lot more in August [2010] when he had no more visits with his biological parents." She also testified that neither child asked for their parents or B.W. after the parental visitations stopped and that both children improved once the visitations stopped.

M.E.S. testified that C.L.W. seemed on track with his speech and occupational development. She further testified that C.L.W. needs a lot of attention due to his age and that he seeks negative attention by getting into trouble.

M.E.S. testified that she does not intend to adopt the children but that they may remain in her home as long as necessary for the Department to find an adoptive family. She also testified that there is nothing about the children that will hinder adoption. M.E.S. testified that she believes it is in the children's best interest to remain in a stable, structured environment and that she is concerned that the children would otherwise regress.

**Jeff Flowers**

13

Jeff Flowers is the children's child advocate volunteer. He testified that his observations of A.C.H.'s developmental delays are consistent with those of M.E.S. Flowers believes that A.C.H. still has room for improvement but that he is not as withdrawn as he was in the beginning. Based on his review of the case file and his interactions and observations of the children during the case, Flowers testified that he thinks termination of parental rights and subsequent adoption is best for the children. The parents did not make any progress toward completing their services before being incarcerated, and Flowers testified that their incarcerations present significant unknowns for the future. Further, Flowers testified that the parents had not shown an ability to provide the children with stability and that he does not believe the children would be harmed by not having future contact with their parents.

**Darlynn Bruton**

Darlynn Bruton testified that she is a licensed chemical dependency counselor and that she became familiar with Mother through her participation in the H.O.P.E. In Jail program. Bruton testified that Mother successfully completed the program and that she had progressed from a "fair" outlook at the beginning to a "very good" outlook by the end of the program. Bruton testified that, in her opinion, Mother had overcome her "denial mechanism" concerning her drug use, had gained insight into what her drug addiction had done to her, and had started to see how her drug use affected her in the long term. She and Mother spent time discussing relapse prevention and developing a plan for regular meeting

14

attendance to avoid future drug use. Bruton testified that Mother recognized the need to take action on her own but to also rely on B.W. and "healthy" friends in the future. Mother had progressed to the point that she began serving as a peer mentor to others in the program. She also testified that she believed the possibility of losing her children was one of Mother's primary motivations for succeeding in the program, that Mother will need additional time in the real world to relearn her behaviors and avoid future drug use, and that she has the tools and motivation to succeed.

**B.W.**

B.W. is Mother's grandfather. He testified that he had seen a very positive change in Mother since she started the H.O.P.E. In Jail program; he noticed a distinct difference in her ability to communicate and to have meaningful conversations.

B.W. testified that he has a very good relationship with the children. He agreed that the Department had initially discussed placing the children with him and that he had expressed reservation because he is almost eighty years' old. However, B.W. denied telling the Department that he definitely would not take care of the children and said that it would be possible for him and his wife to care for the children in their home. He continued with some of the weekly visitations with the children, even after Mother and Father were incarcerated, and he had also attended each visit with Mother before her incarceration. Because he believed he and other family members were available to care for the children,

15

B.W. testified that he did not believe termination of Mother's and Father's parental rights was in the children's best interest.

## B. Trial Court's Judgment

After the trial, the trial court signed a judgment terminating Mother's and Father's parental rights to the children. The trial court found that termination of Mother's and Father's parental rights to the children was in the children's best interest, that Mother and Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, and that Mother and Father had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. The trial court additionally found that Father had knowingly engaged in criminal conduct that had resulted in his conviction for an offense, confinement or imprisonment, and inability to care for the children for not less than two years from the date of filing the petition. This appeal followed.

## III. Standard of Review[6]

---

[6]Neither Father nor Mother clarify whether they challenge the legal or factual sufficiency of the evidence, and they each have language in their briefs that arguably challenges the sufficiency of the evidence on both grounds. Thus, we review both the legal and factual sufficiency of the evidence to support the trial court's findings.

16

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child

as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a

18

reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D), (E), or (Q) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *In re J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

## IV. Endangerment

Father argues in part of his first issue that there is insufficient evidence to support the trial court's endangerment findings, and he asserts in his second issue that termination of his parental rights would violate his rights to due process

19

because the termination cannot be based solely on his temporary incarceration. Mother has not challenged the trial court's endangerment findings.

## A. Applicable Law

The trial court determined that Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review. *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.).

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant*

*Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

Although imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a factor that we may properly consider on the issue of endangerment. *Boyd*, 727 S.W.2d at 533–34; *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). The State is not required to show that incarceration was a result

21

of a course of conduct endangering the child; it must show only that incarceration was part of such a course of conduct. *Boyd*, 727 S.W.2d at 533–34. When incarceration affects the parent's ability to care for his child, to provide safe living conditions, or to ensure her safety and well-being, then such incarceration can be a part of a course of continuing conduct. *See M.R.*, 243 S.W.3d at 819. Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.*, 121 S.W.3d at 133.

## B. Analysis

Father asserts that there is no evidence he used drugs in front of the children and that the initial notice of removal form listed only Mother's drug use as the immediate danger. Father also argues that he never intended to abandon the children before, during, or after his incarceration and contends that termination of his parental rights would violate his right to due process because his incarceration was only a temporary setback, not a permanent abandonment.

While there is no evidence that Father used drugs in the children's presence, that he physically abused the children, or that he intended to permanently abandon the children, there is sufficient evidence to support the trial court's subsection (D) and (E) findings. Mother told Gilley that others living in the Prelude Drive house with her, Father, and the children had used marijuana; had kept drug paraphernalia in the house; and had sold methamphetamines from the house. Mother also admitted to Gilley that she and Father had bad

22

methamphetamine habits. *See S.D.*, 980 S.W.2d at 763 (holding mother's drug use and drug-related criminal activity supported trial court's endangerment finding). Moreover, Father was incarcerated at the time of the termination trial and had also been incarcerated in September 2009 when the Department received the initial negligent supervision referral. Father also had pleaded guilty or nolo contendere over an eleven-year period to assault, drug possession, theft (three times), criminal mischief, and evading arrest or detention. *See M.R.*, 243 S.W.3d at 819 (noting that Father had been incarcerated for twenty-six of child's thirty-six month life, that incarceration prevented Father from "funding better living conditions and financially supporting" child, and that Father's "continued criminality had contributed to the dangerous environment in which [the child] had lived").

In addition, although some of it is conflicting, there is evidence that Father physically abused Mother, sometimes in front of the children. Father admitted to throwing a brick at Mother on one occasion because she was trying to hit him with her truck and to pouring gasoline on Mother's truck during a separate argument. And Mother reported in March 2010 that Father had broken her nose after a visitation. *See id.* (holding that evidence of exposing a child to domestic violence supported endangerment finding). Thus, the trial court's findings under subsections (D) and (E) of section 161.001 are not based solely on Father's temporary incarceration but are supported by his history of drug use, criminal activity, and domestic violence. Applying the appropriate standards of review, we

23

hold that legally and factually sufficient evidence supports the trial court's findings under section 161.001(1)(D) and (E).[7] We therefore overrule the first part of Father's first issue and all of his second issue.

## V. Best Interest

Father argues in the remainder of his first issue and Mother argues in her second issue that the evidence is insufficient to support the trial court's finding that termination of their parental rights is in the children's best interest.

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

---

[7]Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Thus, we need not address the trial court's section 161.001(q) finding. *See id.*; *see also* Tex. R. App. P. 47.1, 47.4.

24

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A) minimally adequate health and nutritional care;

    (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C) guidance and supervision consistent with the child's safety;

    (D) a safe physical home environment;

    (E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

    (F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the

presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Analysis

Father points to evidence that he voluntarily requested anger management classes, that he and the children have a strong bond, that his interaction with the children at visitations was always appropriate, that he sent the children a letter from jail, and that witnesses had reported that Father was a very loving, attentive father at all times. Father also notes that there was no testimony that he was physically abusive toward the children at any time and that his sentence was set to expire within two months of the termination trial. There is also evidence that the children asked for Father after visitations with Mother. Mother argues that termination is not in the children's best interest because she and the children have a strong bond, she interacted appropriately with the children in all visitations, she missed only one visitation before her incarceration, the Department planned to close the case after the initial September 2009 referral but for the December domestic violence allegation, she completed the H.O.P.E. In Jail program, and the Department did not yet have any adoptive family lined up for the children.

While there is evidence favorable to Mother and Father, there is also evidence supporting the trial court's determination that termination of Mother's and Father's parental rights is in the children's best interest. At the time of removal in February 2010, C.L.W. was two, and A.C.H. was three; they each had

lice and needed dental work because of visible tooth decay. The children also had splotchy coloring on their skin and seemed to need more nutritional foods. The children showed "very big improvement" after taking vitamins and eating healthier foods. Also, neither child asked for their parents or B.W. after the parental visitations stopped, and both improved once the visitations stopped. C.L.W.'s speech and occupational development seemed appropriate for his age, but he sought negative attention. A.C.H. was behind developmentally, had shown signs of depression, and was attending occupational therapy and speech therapy. A.C.H. improved over time, but his ability to articulate is still poor. A.C.H.'s social skills improved most after visitations with his parents stopped. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.) (holding sufficient evidence supported best interest finding because the children's emotional and physical needs "would be better served by being with parents more like the foster mother"; because the children had tooth deterioration, required speech therapy, exhibited social and emotional developmental delay; and because of parents' continued drug use).

There is also evidence of multiple domestic violence incidents between Mother and Father, sometimes with the children present. Father admitted throwing a brick at Mother and said the brick hit Mother in her side, and he claimed to have done so because Mother was trying to run into him with her truck. Father also admitted pouring gasoline on Mother's truck during a later argument, and Mother reported in March 2010 that Father had broken her nose.

There is conflicting evidence concerning the December 2009 incident, but a witness called the police after seeing an altercation between Mother and Father in the street and noticing that both children were present. Mother and Father also have a history of marijuana and methamphetamine use. Mother admitted continued drug use after the children's removal. There is also evidence that methamphetamine was sold from the Prelude Drive house while the children lived there. *See M.R.*, 243 S.W.3d at 820 (holding sufficient evidence supported best interest finding because, among other things, children had been exposed to domestic violence and drug abuse).

Mother and Father initially expressed eagerness to work their services and regain possession of their children, but Mother and Father had not submitted to drug assessments or worked any of their services by May 2010. Father did submit to a drug assessment in May 2010, but he was incarcerated shortly thereafter. Collins acknowledged that parents often take six months to start working their services, but she did not comment on whether those parents successfully defend suits to terminate their parental rights. *See In re Y.G.*, No. 07-11-00349-CV, 2012 WL 652466, at *6–7 (Tex. App.—Amarillo Feb. 29, 2012, no pet.) (mem. op.) (holding sufficient evidence supported best interest determination because, among other things, the father had not completed any of his services and had continued using drugs after the children's removal).

Mother successfully completed the H.O.P.E. In Jail program after being ordered into the program, and she enjoyed the program and served as a peer

29

mentor. Bruton testified that she and Mother had discussed relapse prevention and a plan for regular meeting attendance to avoid future drug use. Despite Mother's completion of the in-jail drug program, Jones testified that termination of Mother's and Father's parental rights is in the children's best interest because the children need stability and a forever home and because Mother and Father cannot provide that for the children. Jones also testified that Mother's release from incarceration during the trial did not affect her opinion because Mother still had "a ways to go" with the services she did not work before going to jail. *See In re T.T.F.*, 331 S.W.3d 461, 488 (Tex. App.—Fort Worth 2010, no pet.) (addressing best interest and stating that "[t]he evidence of [the mother]'s improved parenting skills and stability must be balanced against the relative brevity of her stability in light of her age").

Several witnesses expressed their opinions that Mother and Father have good relationships with the children. Overstreet testified that she believed Father was a "really good dad," that he was "always very attentive to the kids," and that he "just seemed like any other dad with his children." Overstreet similarly testified that Mother is a good and loving mom, and the foster mother testified that Mother attended the doctor's appointment and seemed appropriately concerned for C.L.W. when C.L.W. had tubes placed in his ears. But Overstreet acknowledged that good parents do not use methamphetamines, engage in domestic violence in front of their children, or commit criminal acts that result in incarceration.

Also, Mother and Father have not provided a stable home for the children. Father was incarcerated at the time of the initial referral for violating his probation, and he had pleaded guilty or nolo contendere over an eleven-year period to seven different criminal offenses. Mother did not yet have a criminal record in September 2009, but she was charged with possession of a controlled substance in April 2010 and placed on probation, and she had a pending indictment for allegedly falsifying a government document at the time of the termination trial. *In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating that the father's incarceration and pattern of criminal and violent conduct made it likely that he would face incarceration again in the future).

Gilley testified that none of the placement options proposed by Mother were acceptable. The foster mother testified that she does not intend to adopt the children but that they may remain in her home as long as necessary for the Department to find an adoptive family. She also testified that she does not think finding an adoptive home will be difficult, that it is in the children's best interest to remain in a stable, structured environment, and that she is concerned that the children would otherwise regress.

Applying the appropriate standards of review and considering the applicable best-interest factors listed above, we hold that legally and factually sufficient evidence supports the trial court's findings that termination of Mother's

31

and Father's parental rights is in the children's best interest. We therefore overrule the remainder of Father's first issue and all of Mother's second issue.

## VI. Mother's Remaining Issues

Mother argues in her third issue that the trial court abused its discretion by denying her oral motion for continuance and her written motion to extend the statutory dismissal date. She argues in her first issue that the trial court violated her due process rights by failing to release her from a bench warrant.

## A. Denial of Mother's Motions for Continuance and for Extension of Statutory Dismissal Date

In her third issue, Mother complains about the trial court's denial of her oral motion for continuance and her written motion for an extension of the statutory dismissal date.

### 1. Oral Motion for Continuance

A motion for continuance shall not be granted except for sufficient cause supported by an affidavit, through consent of the parties, or by operation of law. Tex. R. Civ. P. 251; *see In re E.L.T.*, 93 S.W.3d 372, 374 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Here, Mother's counsel made an oral motion for continuance just before the termination trial began on January 10, 2011. However, the record does not contain a written motion for continuance or an affidavit. If a motion for continuance is not made in writing and verified, it will be presumed that the trial court did not abuse its discretion by denying the motion. *See Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *E.L.T.*, 93 S.W.3d at

375. Because Mother did not comply with rule 251, the trial court did not abuse its discretion by denying her oral motion for continuance.[8]  *See Villegas,* 711 S.W.2d at 626; *see also In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at *8 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.); *In re T.D.N.*, No. 14-07-00387-CV, 2008 WL 2574055, at *1 (Tex. App.—Houston [14th Dist.] June 26, 2008, no pet.) (mem. op.) (holding trial court did not abuse its discretion by denying oral motion for continuance because appellant did not comply with rule of civil procedure 251).  Accordingly, we overrule this portion of Mother's third issue.

### 2. Motion to Extend Statutory Dismissal Date

A trial court must dismiss a suit affecting the parent-child relationship if it has not rendered a final order or granted an extension on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the Department as temporary managing conservator.  Tex. Fam. Code Ann. § 263.401(a) (West 2008).  The trial court may grant an extension of up to 180 days if it finds that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child."  *Id.* § 263.401(b).  Because an

---

[8]Moreover, Mother based her oral motion for continuance on the absence of her H.O.P.E. In Jail counselor.  We note, however, that Mother's counselor testified during the second day of the trial.

extension of the dismissal date is similar to a continuance and section 263.401(b) does not specify which appellate standard of review should apply, we apply the abuse of discretion standard. *T.T.F.*, 331 S.W.3d at 476.

Here, Mother's counsel "reurged" Mother's motion to extend the statutory dismissal date on the first morning of trial.[9]  Mother argued that she was scheduled to be released from jail the next day, that she had appointments for life skills classes and a psychological assessment within a week, and that she had successfully completed the services provided to her in jail.  The Department opposed Mother's motion because of Mother's pending criminal case in Tarrant County, arguing that the criminal charge could result in additional incarceration. The children's attorney ad litem also opposed the extension, arguing that the conduct that resulted in Mother's incarceration occurred after the children were removed by the Department and that Mother did not take advantage of the services offered to her before her incarceration.  The trial court denied the motion.  Particularly given Mother's failure to work the services offered to her before her incarceration, we cannot say that the trial court abused its discretion by denying an extension of the statutory dismissal date so that Mother could have more time to complete her services. *See Shaw v. Tex. Dep't of Family & Protective Servs.*, No. 03-05-00682-CV, 2006 WL 2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.) (holding mother did not show that

---

[9]Nothing in the appellate record shows that the motion for extension had previously been presented to and ruled on by the trial court.

needing more time after failing to make progress on the service plan for eight months amounted to extraordinary circumstances). We therefore overrule the remainder of Mother's third issue.

## B. Bench Warrant

Mother argues in her first issue that the trial court "denied [her] due process rights by failing to release [her] from the bench warrant[,] preventing Mother's release from Tarrant County Jail." The record reflects that the trial court granted Mother's request for a bench warrant so that Mother could be brought from Johnson County to Tarrant County to attend trial beginning January 10, 2011, that Mother was scheduled to be released from Johnson County at midnight January 10, 2011, but that Mother was still in the custody of Tarrant County (but present at trial) on the morning of January 12, 2011.[10] In that regard, two portions of the record are relevant to Mother's first issue. First, the following exchange occurred between Mother's counsel and the trial court before trial resumed on the morning of January 12:

> THE COURT: I think, first of all, that we have [Mother's counsel] who wishes to make a comment to the court or a statement.
>
> [Mother's counsel]: Just for the record, my client appears here today. She's still in the custody of the Tarrant County jail and she was transported over by the Tarrant County Sheriff's department. She was on a bench warrant out of Johnson County to Tarrant County. Her sentence and her terms for Johnson County ended at

---

[10]There was apparently a recess in the trial from the end of the day on January 10 until the morning of January 12. The reporter's record does not contain any proceedings from January 11.

midnight on January 10th, and she was not released. I did speak with the Johnson County Sheriff's Department and they had indicated that they had sent the order to release her, and when I spoke with the Tarrant County Sheriff's Department, they had indicated that she was being held based upon the bench warrant out of this court, and I know that we spoke off the record and I just wanted to clarify that she shouldn't be incarcerated today and I'm not sure why she is appearing here today. It seems to me now that she's served a second day in jail in Tarrant County without cause and without justification, and I'd like to make sure that's on the record and the Court can make clarifications about that.

THE COURT: All I can say is that I wanted to insure that rather than being in jail in Johnson County, she was available, your client was available, to you, and I made it very clear if Johnson County released her, she was released, and I don't know really what happened with the jail, but that was — I did have her benched over here to be available to you for this trial, but I made it clear to my staff that, you know, Johnson County has authority in terms of her incarceration, not me. I just wanted her here for this trial.

Second, the following exchange occurred just before the lunch recess on

January 12:

THE COURT: [Mother's Counsel], I've done a little research about what we can do about releasing your client from incarceration, and I can send her right now to be released. She'll go to Johnson County and probably not be able to be here for the rest of this hearing today. It's your option. I'm more than willing to release her to be transported downtown to then be transported to Johnson County, but I'm reconvening at two o'clock. I have to attend a meeting downtown right now, so I'm going to have to recess for pretty much an hour, but I'll reconvene at two o'clock, so I need to know right now if you want me to have her transported or if you'd like her to remain here.

[Mother's Counsel]: If I could have three minutes with my client, obviously, if we could have done it yesterday, it would —

THE COURT: All right.

36

(Off-the-record discussion here.)

[Mother's Counsel]: Your Honor, do we have the rest of the afternoon from two to five today, or is there another setting?

THE COURT: That's my plan, yes. I think that's my plan.

(Off-the-record discussion here.)

[Mother's Counsel]: My client said that she'd like to be transported for release. On the record, my client has indicated that she does want to be released in accordance with her original release date, so she'll be transported down to the Tarrant County jail to begin that process, is that correct?

THE COURT: That's correct. And you understand that we'd have to proceed without her this afternoon?

[Mother's Counsel]: I understand that, Your Honor. I know that the State has a couple more witnesses and there are some other witnesses, so it's my hope she'll be returning before the completion of the trial.

[Department's Counsel]: I'd just like it to be clear, then, would it be [Mother's Counsel]'s intent then to ask for a continuance in the event that her client doesn't appear and we're at a point where she had no other witnesses?

[Mother's Counsel]: No, Your Honor. We would waive that, and we would not be asking for a continuance in the event she doesn't return before the completion of the trial.

THE COURT: All right. I'll release her for transfer, and we'll reconvene at two o'clock.

This and other courts review trial court rulings on issues relating to bench warrants for an abuse of discretion. *In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003); *In re D.D.J.*, 136 S.W.3d 305, 311–14 (Tex. App.—Fort Worth 2004, no pet.). To determine whether a trial court abused its discretion, we must decide

37

whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

Mother argues that "[s]eemingly, the Court required [Mother] to choose her freedom, although wrongly restrained, or her presence at her trial on the termination of her parental rights." To the extent Mother contends the trial court should have continued the case until she could return from Johnson County after her release from incarceration, the trial court did not abuse its discretion because Mother expressly waived any continuance based on her absence. Otherwise, Mother does not specify in her appellate brief what she contends the trial court should have done differently under these circumstances. Thus, Mother has not shown that the trial court abused its discretion, and we overrule her first issue.

## VII. Conclusion

Having overruled each of Father's and Mother's issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  GARDNER, MCCOY, and GABRIEL, JJ.

DELIVERED:  April 19, 2012